Allison Whitehill (036339)
Gary Bendinger (036251)
Katie Derrig (037110)
LEWIS ROCA ROTHGERBER CHRISTIE LLP
201 East Washington Street, Suite 1200
Phoenix, AZ 85004
602.262.5311
awhitehill@lewisroca.com
gbendinger@lewisroca.com
kderrig@lewisroca.com

Justin W. Bernick*
Danielle Desaulniers Stempel*
Michael J. West*
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
202.637.5600
justin.bernick@hoganlovells.com
danielle.stempel@hoganlovells.com
michael.west@hoganlovells.com

(*Additional Counsel for Plaintiffs Listed on the Following Page*)

(**Pro hac vice application forthcoming*)

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| P.C.J., on his own behalf and on behalf of his minor child, M.C.J.; and O.P.V. on his own behalf and on behalf of his minor child, T.P.C.<br><br>Plaintiffs,<br><br>v.<br><br>United States of America,<br><br>Defendant. | No. _____<br><br>**COMPLAINT** |

1   Dana A. Raphael*
    Melissa Giangrande*
2   HOGAN LOVELLS US LLP
    Columbia Square
3   555 Thirteenth Street, NW
    Washington, DC 20004
4   202.637.5600
    dana.raphael@hoganlovells.com
5   melissa.giangrande@hoganlovells.com

6   David Willner*
    HOGAN LOVELLS US LLP
7   Two North Cascade Avenue, Suite 1300
    Colorado Springs, CO 80903
8   303.899.7300
    david.willner@hoganlovells.com

9
    Vanessa Rivas-Bernardy*
10  REFUGEE AND IMMIGRANT CENTER FOR EDUCATION
    AND LEGAL SERVICES (RAICES)
11  5121 Crestway Drive, Suite 105
    San Antonio, TX 78239
12  210.538.7382
    vanessa.rivas@raicestexas.org
13
    (*Pro hac vice application forthcoming)
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **INTRODUCTION**

1.      This case seeks damages for harms suffered under an unprecedented policy designed to intentionally and systematically separate asylum-seeking parents from their children at the United States border.  Over the course of several months in 2018, the United States government separated thousands of families.  It was not until the issuance of a class-wide preliminary injunction in June 2018 that the government began to haphazardly reunite families.[1]  But reunification did not end the suffering for many of the families who had been torn apart.  In fact, several of the reunited families were later torn apart *again*—in direct violation of a court order.  Those separations caused significant and lasting trauma to both the children and their parents, including Plaintiffs—two parents and their children—who were forcibly and unlawfully separated on two occasions.

2.      That harm was no accident—it was the government's goal.  Federal officials at the highest levels repeatedly and publicly confirmed that the Family Separation Policy ("the Policy") was designed to inflict trauma in order to deter future asylum seekers from coming to the United States.  Then-Acting Assistant Secretary of the Department of Health and Human Services (HHS) Steven Wagner told reporters that "[w]e expect that the new [separation] policy will result in a deterrence effect, we certainly hope that parents stop bringing their kids on this dangerous journey and entering the country illegally."[2]  Then-Attorney General Jeff Sessions stated that "[w]e need to take away children . . . If [they] care about kids, don't bring them in."[3]  And even after a federal judge enjoined the Policy because separated parents were likely to succeed on their claim that the separations were

---

[1] *See Ms. L. v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133, 1142-46, 1149 (S.D. Cal. 2018), *modified by*, 330 F.R.D. 284 (S.D. Cal. 2019).

[2] Philip Bump, *Here Are the Administration Officials Who Have Said That Family Separation Is Meant as a Deterrent*, Wash. Post (June 19, 2018, 9:14 PM), https://www.washingtonpost.com/news/politics/wp/2018/06/19/here-are-the-administration-officials-who-have-said-that-family-separation-is-meant-as-a-deterrent.

[3] Michael D. Shear, Katie Benner & Michael S. Schmidt, *'We Need to Take Away Children,' No Matter How Young, Justice Dept. Officials Said*, N.Y. Times (Oct. 28, 2021), https://www.nytimes.com/2020/10/06/us/politics/family-separation-border-immigration-jeff-sessions-rod-rosenstein.html.

unconstitutional,[4] President Donald Trump continued to promote the Policy's deterrent purpose, telling reporters that "[i]f they feel there will be separation, they don't come,"[5] and tweeting "if you don't separate, FAR more people will come."[6]

3.     Not content to merely separate parents and their minor children, the government continued to traumatize families by refusing to provide information on their missing family members or to implement adequate measures to ensure reunification.

4.     Plaintiffs' experiences are representative of the thousands of families separated under the Policy.  Both Plaintiff families were detained in unsafe and inhumane conditions, without adequate food, water, bedding, or space to sleep.  They were housed in facilities with inadequate restrooms and forced to go days or weeks without access to clean water.

5.     Both Plaintiff families were separated with no notice, no information, and no plan for reunification.  For weeks, the parents and children were detained separately, sometimes thousands of miles apart.  For weeks, the parents and children begged to be reunited.   And for weeks, the government—due to a combination of ineptitude and cruelty—refused to provide information on their loved ones' whereabouts, wellbeing, or whether they would ever see each other again.

6.     That was only the beginning. After the Plaintiff families were finally reunited, they were forcibly ripped apart a second time less than one month later, further compounding the extreme trauma and harm they had already suffered.

---

[4] *Ms. L.*, 310 F. Supp. 3d at 1142-46.

[5] David Shepardson, *Trump Says Family Separations Deter Illegal Immigration*, Reuters (Oct. 13, 2018), https://www.reuters.com/article/us-usa-immigration-trump/trump-says-family-separations-deter-illegal-immigration-idUSKCN1MO00C.

[6] Donald Trump (@realdonaldtrump), Twitter (Dec. 16, 2018, 11:25 AM), https://twitter.com/realDonaldTrump/status/1074339834351759363 [https://web.archive.org/web/20190216145802/https://twitter.com/realDonaldTrump/status/1074339834351759363]; *see also* Kimberly Kindy, Nick Miroff & Maria Sacchetti, *Trump Says Ending Family Separation Practice Was a "Disaster" That Led to Surge in Border Crossings*, Wash. Post (Apr. 28, 2019), https://www.washingtonpost.com/politics/trump-says-ending-family-separation-practice-was-a-disaster-that-led-to-surge-in-border-crossings/2019/04/28/73e9da14-69c8-11e9-a66d-a82d3f3d96d5_story.html.

7.      In the end, despite tens of thousands of hours and millions of dollars, the Family Separation Policy failed to deter asylum-seekers from coming to the United States.[7] But it did accomplish one of the Administration's goals: inflicting untold physical, mental, and emotional harm on countless children and parents—including Plaintiffs.  Those harms began with the families' detentions in the notorious "iceboxes.".  But they did not end on the families' release, or even upon reunification.

8.      Both parents and children continue to suffer today from the long-term toll wrought by their forcible separations.  Plaintiffs must live with that trauma and its lasting effects for the rest of their lives.  Justice requires redress for their suffering at the hands of the government's unlawful and inhumane policy and for the second unlawful separation at Karnes County Immigration Processing Center ("Karnes").  The United States is liable for those harms and should be held accountable under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2671 (FTCA).

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this Complaint under 28 U.S.C. §§ 1331, 1346(b).

10.      On March 20, 2020, P.C.J. and M.C.J.[8] submitted administrative claims to the United States Department of Homeland Security (DHS), United States Customs and Border Protection (CBP), United States Immigration and Customs Enforcement (ICE), United States Citizenship and Immigration Services (USCIS), and HHS.  On March 25, 2020, O.P.V. and T.P.C. submitted administrative claims to DHS, CBP, ICE, USCIS, and HHS. On May 18, 2022, P.C.J., M.C.J., O.P.V., and T.P.C. submitted amended SF-95s to DHS, CBP, ICE, USCIS, and HHS that relate back to their original filings.  *See* 28 C.F.R. § 14.2(c).

---

[7] U.S. Dep't of Homeland Sec., Off. of Inspector Gen., *OIG-20-06*, *DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families* 34 (2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-11/OIG-20-06-Nov19.pdf [hereinafter *DHS OIG Technology Report*].

[8] Plaintiffs are concurrently filing a motion to proceed under pseudonyms.

11.     Because none of the agencies have made a final disposition of Plaintiffs' administrative claims and six months have passed since the submission of Plaintiffs' administrative claims, they are deemed finally denied.   *See* 28 U.S.C. § 2675(a). Accordingly, Plaintiffs have exhausted all available administrative remedies under the FTCA and may file this action against the federal government. *See id.*

12.     Because the acts and omissions which are the subject of this Complaint occurred in this District, venue is proper under 28 U.S.C. §§ 1402(b), 1391(e)(1).

**PARTIES**

13.     Plaintiff P.C.J. resides in Oakland, California with his minor son, M.C.J. When federal officials separated M.C.J. from his father, M.C.J. was thirteen years old. P.C.J. and M.C.J. are currently seeking asylum in the United States.  Plaintiff P.C.J. brings this action on his own behalf and, independently, on his son's behalf as his next friend.

14.     Plaintiff O.P.V. resides in Dalton, Georgia with his minor son, T.P.C.  When federal officials separated T.P.C. from his father, T.P.C. was seven years old.  Plaintiff O.P.V. brings this action on his own behalf and, independently, on his son's behalf as his next friend.

15.     Defendant United States of America is the appropriate defendant under the FTCA.  28 U.S.C. §§ 1346(b)(1), 2679(a).

16.     All federal officers and officials referenced in this Complaint were at all relevant times employees of the United States, working within the scope and course of their employment with federal agencies including, but not limited to, DHS, ICE, CBP, and HHS.

17.     DHS employees are responsible for separating O.P.V. and P.C.J. from their children.  DHS employees are also responsible for supervising and maintaining detained individuals at CBP and ICE facilities, including the facilities where Plaintiffs were detained before and at the time of their separations, and where O.P.V. and P.C.J. were detained during the course of their separations from their children.

18.     HHS employees are responsible for supervising and managing the detention of children the government classifies as unaccompanied, including the facilities where T.P.C. and M.C.J. were detained while they were separated from their parents.

19.     Officials from DHS, HHS, and the Department of Justice (DOJ) worked together to design and promulgate the unlawful and unconstitutional Family Separation Policy, pursuant to which Plaintiffs were subjected to significant harm.

20.     All DHS, ICE, CBP, HHS, and other officers referenced in this Complaint who interacted with Plaintiffs were at all relevant times acting as investigative or law enforcement officers.  28 U.S.C. § 2680(h).

## STATEMENT OF FACTS

**A.     The Family Separation Policy**

### 1.     The Government Begins Planning A Family Separation Policy With Knowledge Of And Intent To Cause Harm.

21.     A hallmark of the Trump Administration was its relentless focus on reducing the number of individuals seeking refuge in the United States.[9]

22.     Consistent with that mission, only weeks after inauguration day, John Lafferty, then-Chief of the Asylum Division at USCIS, held an inter-governmental town-hall meeting where he described a new potential policy designed to deter asylum-seekers from migrating to the United States with their children.  The centerpiece of this new policy was separating parents from their children upon arrival at the southern border to intimidate or stop others from exercising their legal right to seek asylum in the United States.[10]  On

---

[9] *See, e.g.*, Am. Immigr. Laws. Ass'n, *Tracking Notable Executive Branch Action During the Trump Administration* (May 20, 2022), https://www.aila.org/infonet/tracking-notable-executive-branch-action (listing over 50 proposed and promulgated changes to immigration-related regulations during the last two years of the Trump Administration).

[10] Julia Edwards Ainsley, *Exclusive: Trump Administration Considering Separating Women, Children at Mexico Border*, Reuters (Mar. 3, 2017), https://www.reuters.com/article/us-usa-immigration-children/exclusive-trump-administration-considering-separating-women-children-at-mexico-border-idUSKBN16A2ES.

March 6, 2017, then-DHS Secretary John Kelly confirmed that the Administration was considering family separation as an immigration deterrent.[11]

23.    That policy would be a radical break from longstanding federal border policy, which prioritized keeping arriving families together.[12]   The Administration also acknowledged in internal documents that "[t]he separation of children from their families could be considered a human rights abuse."[13]  Nevertheless, the Administration launched a family separation pilot program in CBP's El Paso Sector in July 2017.[14]

24.    Under this pilot program, the government began to aggressively prosecute parents who crossed the border with children, detain the parents, and forcibly take their children away from them.[15]  Pursuant to the pilot program, Border Patrol contacted the U.S. Attorney's office "to seek prosecution for the adults of <u>every</u> family unit arrived."[16]  "There

---

[11]  *Kelly: Separating Families under Consideration*, CNN (Mar. 6, 2017), https://www.cnn.com/videos/politics/2017/03/06/trump-travel-ban-separate-parents-children-kelly-tsr-bts.cnn; *see also* Caitlin Dickerson, *The Family Separation Files*, The Atlantic (Dec. 31, 2022), https://www.theatlantic.com/politics/archive/2012/12/the-secret-history-of-family-separation-document-collection/672146/ ("As a method of migration deterrence, the Department of Homeland Security (DHS) is considering a policy of separating immigrant children from their families. In this plan, DHS would refer the accompanied but separated children to the Office of Refugee Resettlement (ORR).").

[12]  In order to preserve family unity, DOJ had for years generally declined to "refer parents in family units who were apprehended at the border for illegal entry prosecution if the referral would result in children being separated from their parents." *See* U.S. Dep't of Just., Off. of Inspector Gen., *Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Health and Human Services* 14 (2021), https://oig.justice.gov/sites/default/files/reports/21-028_0.pdf [hereinafter *DOJ OIG Planning Report*].  Similarly, DHS had a longstanding policy of keeping arriving immigrant families intact as their immigration cases were handled by immigration officials. *Id.* at 9 ("At the time, DHS was pursuing such family unit adult cases administratively rather than criminally, consistent with its longstanding policy related to concerns about separating children from parents.").

[13]  Ex. 18, Pls.' Reply In Supp. of Mot. to Compel Review of Docs. *In Camera, C.M. v. United States*, No. 2:19-cv-05217-SRB (D. Ariz. June 7, 2022), ECF No. 210-2 at 83 (HHS March 2017 Report).

[14]  *See DHS OIG Technology Report*, *supra* note 7, at 5.

[15]  *Id.* at 2.

[16]  Caitlin Dickerson, *The Secret History of the U.S. Government's Family Separation Policy*: *"We Need to Take Away Children,"* The Atlantic (Aug. 7, 2022), https://www.theatlantic.com/magazine/archive/2022/09/trump-administration-family-separation-policy-immigration/670604/ (quoting memorandum regarding Field Guidance on FUMA (July 10, 2017)).

is no longer a requirement for the adult to have an immigration or criminal history."[17]  After the *government* had separated the children from their parents, it designated the children as "unaccompanied minors" and placed them in the custody of HHS's Office of Refugee Resettlement (ORR).[18]

25.    ORR was not informed of the pilot program or that the children being sent to its custody had, in fact, arrived with parents but were separated from them.[19]  Nor did the government keep track of the families it had separated.[20]  As a result, parents and children were detained incommunicado from one another and with no information about one another's location or wellbeing.[21]

26.    These "harsh circumstances" were not a bug; they were a feature.  As a Border Patrol official explained in an email advocating for expanding the pilot program, "it is the

---

[17] U.S. Customs & Border Protection ("CBP"), *El Paso Sector Family Unit Assessment* 1-2 (Nov. 1, 2017), https://www.documentcloud.org/documents/22124198-el-paso-sector-family-unit-assessment ("Both the Western District of Texas and District of New Mexico are prosecuting all amenable adults who entered as part of a family unit. Prior to this agreement, . . . separation was limited due to the fact that parents were required to have prior criminal and/or immigration history before separation was approved.").

[18] *See* Ex. 1, Pls.' Reply In Supp. of Mot. to Compel Review of Docs. *In Camera, C.M. v. United States*, No. 2:19-cv-05217-SRB (D. Ariz. June 7, 2022), ECF No. 210-2 at 2 ("DHS proposes separating children in family units from their parents and referring them to ORR as Unaccompanied Alien Children (UACs). . . . DHS stressed to[] ORR that the overall intent of the actions is to serve [as] a deterrent in the longer term[.]"). *See* Caitlin Dickerson, *Trump Administration in Chaotic Scramble to Reunify Migrant Families*, N.Y. Times (July 5, 2018), https://www.nytimes.com/2018/07/05/us/migrant-children-chaos-family-separation.html.

[19] Comm. on the Judiciary, U.S. House of Representatives, *The Trump Administration's Family Separation Policy: Trauma Destruction, and Chaos, Majority Staff Report* 9 (2020), https://judiciary.house.gov/uploadedfiles/the_trump_administration_family_separation_policy_trauma_destruction_and_chaos.pdf?utm_campaign=4526-519 [hereinafter *House Report*] ("Despite the impact on the agency, ORR was not informed of the ongoing pilot program for at least three months after its initiation.").

[20] *See* Jacob Soboroff, *Emails Show Trump Admin Had 'No Way to Link' Separated Migrant Children to Parents*, NBC News (May 1, 2019, 7:30 PM, https://www.nbcnews.com/politics/immigration/emails-show-trump-admin-had-no-way-link-separated-migrant-n1000746 ) ("'[I]n short, no, we do not have any linkages from parents to [children], save for a handful,' a [HHS] official told a top [ICE] official on June 23, 2018. 'We have a list of parent alien numbers but no way to link them to children.'").

[21] *DOJ OIG Planning Report*, *supra* note 12, at 16.

hope that this separation will act as a deterrent to parents bringing their children into the harsh circumstances that are present when trying to enter the United States illegally."[22]

27. After separating at least 281 individuals, the El Paso pilot program formally wrapped up in November 2017.[23]

> **2. The Government Launches A Full-Scale Policy Of Forcibly Separating Parents From Their Minor Children With Knowing Intent To Cause Severe Emotional Harm To Deter Future Asylum Seekers From Central America.**

28. On December 11, 2017, eight organizations, including RAICES, sent a letter to the DHS Office for Civil Rights and Civil Liberties and the DHS Acting Inspector General urging an investigation into the pilot program and a stop to DHS's "practice of separating families for purposes of punishment and deterrence," emphasizing "the immense trauma created by the separation of family members and the impact of separation on their ability to pursue legal immigration relief."[24]   The letter also raised concerns about the government's handling of separations, explaining that "DHS and its components continue to lack the ability to track familial relationships of individuals who are transferred to . . . [ICE] custody or to coordinate mechanisms to work with ORR within . . . [HHS] or . . . [DOJ] to facilitate location of, contact with, or release and reunification with separated family members."[25]   As a result, "[f]amily members are given little to no information on what happens to those from whom they are separated, including how to locate, contact, or reunite with them."[26]

---

[22] *See id.* at 15 n.30 (quoting an e-mail sent on July 28, 2017 to Jim Tierney, the acting United States Attorney for the District of New Mexico).

[23] U.S. Dep't of Health & Human Servs., Off. of Inspector Gen., *OEI-BL-18-00511, Separated Children Placed in Office of Refugee Resettlement Care* 3 (2019), https://oig.hhs.gov/oei/reports/oei-BL-18-00511.pdf; *see* Dickerson, *supra* note 16 (placing the minimum number of children separated as of November 30, 2017 at 868).

[24] Letter from Eight Non-Profit Organizations to Cameron Quinn, DHS Officer for Civil Rights and Liberties, and John Kelly, DHS Acting Inspector General 2 (Dec. 11, 2017), https://www.womensrefugeecommission.org/wp-content/uploads/2020/04/Family-Separation-Complaint-FINAL-PUBLIC-12-11-17.pdf.

[25] *Id.* at 6.

[26] *Id.*

29.     Despite these warnings, the government pressed on.  In December 2017, senior officials at DOJ and DHS exchanged a draft memorandum titled "Policy Options to Respond to Border Surge of Illegal Immigration."[27]  The first two policies outlined in the memorandum were titled "Increased Prosecution of Family Unit Parents" and "Separate Family Units."[28]  Under the proposed prosecution policy, "parents would be prosecuted for illegal entry . . . and the minors present with them would be placed in HHS custody as [unaccompanied alien children]."[29]  According to the memorandum, "the increase in prosecutions would be reported by media and it would have substantial deterrent effect."[30] To be safe, however, the memorandum recommended "public[ly] announc[ing] this policy before   implementation."[31]    The   second   policy   option   likewise   recommended "[a]nnounc[ing]" that, under the Family Separation Policy, adults would be placed in detention while children would be placed in HHS custody.[32]

30.     On April 6, 2018, then-Attorney General Sessions officially announced a "zero-tolerance policy" that extended the El Paso family separation pilot program to the entire southern border.[33]  Under the zero-tolerance policy, which came to be known as the "Family Separation Policy," DOJ mandated the criminal prosecution of *all* persons who crossed the United States border, regardless of whether they were seeking asylum or

---

[27] *Policy Options to Respond to Border Surge of Illegal Immigration* 1 (Dec. 16, 2017), https://www.documentcloud.org/documents/5688664-Merkleydocs2.html [hereinafter *Policy Options*]; *DOJ OIG Planning Report*, *supra* note 12, at 12-14; *see also* Julia Ainsley, *Trump Admin Weighed Targeting Migrant Families, Speeding Up Deportation of Children*, NBC News (Jan. 17, 2019, 8:40 PM), https://www.nbcnews.com/politics/immigration/trump-admin-weighed-targetingmigrant-families-speeding-deportation-children-n958811 (explaining that the December 2017 policy options draft plan was made public by the Office of Senator Jeff Merkley).

[28] *Policy Options*, *supra* note 27.

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] U.S. Dep't of Just., Off. of Pub. Affs., *Attorney General Announces Zero Tolerance Policy for Criminal Illegal Entry* (Apr. 6, 2018), https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry.

arriving with children.[34]  "On May 4, 2018, with the urging of Sessions," then-DHS Secretary Kirstjen Nielsen signed the DHS policy directing CBP to refer for prosecution adults arriving in family units.[35]  In a follow-up memorandum issued on May 11, 2018, Secretary Nielsen added that, "in accordance with the President's direction and the Attorney General's zero tolerance policy, commencing as soon as possible, I direct all DHS law enforcement officers at the border to refer all illegal border crossers to the Department of Justice for criminal prosecution."[36]

31.    The Policy's logic and messaging was straightforward: inflict enough harm to discourage migration and deter people from seeking asylum.[37]  As Sessions explained in a press conference on May 7, 2018, "I have put in place a 'zero tolerance' policy for illegal entry on our Southwest border.  If you cross this border unlawfully, then we will prosecute you.  It's that simple."[38]  And if you cross the border with a child, Sessions added, "then we will prosecute you and that child will be separated from you."[39]  Sessions's staff apparently referred to this last point—the threat of child separation—as the "money line."[40]

32.    The government pretextually justified the Family Separation Policy by emphasizing its "legal obligation to protect the best interests of the child whether that be

---

[34] *DOJ OIG Planning Report*, *supra* note 12, at 1.

[35] *Id.*

[36] Memorandum from Kirstjen M. Nielson, Secretary of the U.S. Dep't of Homeland Sec. to Thomas D. Homan of the U.S. Immigr. & Custom Enf't, et al. (May 11, 2018).

[37] President Trump repeatedly acknowledged that the practice of separating families was intended as a "disincentive" for entering the country.  Kindy, et al., *supra* note 6; Shepardson, *supra* note 5 (quoting President Trump's statement that if asylum applicants "feel there will be separation, they don't come").

[38] U.S. Dep't of Just., Off. of Pub. Affs., *Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration* (May 7, 2018), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions.

[39] *Id.*

[40] Dickerson, *supra* note 16.

from human smugglings, drug traffickers, or nefarious actors who knowingly break [U.S.] immigration laws and put minor children at risk."[41]  As Nielsen claimed in June 2018:

> DHS is not separating families legitimately seeking asylum at ports of entry.  If an adult enters at a port of entry and claims asylum, they will not face prosecution for illegal entry.  They have not committed a crime by coming to the port of entry . . . We will only separate the family if we cannot determine there is a familial relationship, if the child may be at risk with the parent or legal guardian, or if the parent or legal guardian is referred for prosecution.[42]

33.     That, of course, turned out to be false.  As implemented, the Policy resulted in officials separating *all* parents from their children, even if the parents were not criminally prosecuted or in criminal custody.  The government designated *every* family unit adult who crossed the border between ports of entry as amenable for prosecution and separated the adults and children *before* any decision was made whether to actually prosecute.[43]  Because

---

[41] *See* Maria Sacchetti, *Top Homeland Security Officials Urge Criminal Prosecution of Parents Crossing Border with Children*, Wash. Post (Apr. 26, 2018, 7:58 PM), https://www.washingtonpost.com/local/immigration/top-homeland-security-officials-urge-criminal-prosecution-of-parents-who-cross-border-with-children/2018/04/26/a0bdcee0-4964-11e8-8b5a-3b1697adcc2a_story.html.    Other than the government's Family Separation Policy, there was no basis for removing Plaintiff-Children from Plaintiff-Parents.  And contrary to the government's claim, "no statute or regulation mandat[ed] the separation of [families] upon their entry into the country." *C.M. v. United States*, No. CV-19-05217-PHX-SRB, 2020 WL 1698191, at *3 (D. Ariz. Mar. 30, 2020), *motion to certify appeal denied*, No. CV-19-05217-PHX-SRB, 2020 WL 5232560 (D. Ariz. July 6, 2020). Instead, "[t]he separations were conducted pursuant to executive policy." *Nunez Euceda v. United States*, No. 2:20-cv-10793-VAP-GJSx, 2021 WL 4895748, at *4 (C.D. Cal. Apr. 27, 2021); *see also A.P.F. v. United States*, 492 F. Supp. 3d 989, 996 (D. Ariz. 2020) ("[T]he family separations were conducted pursuant to executive policy, not pursuant to any statute or regulation.").

[42] Kirstjen Nielsen, Sec'y, U.S. Dep't of Homeland Sec., White House Press Briefing (June 18, 2018), http://www.whitehouse.gov/briefings-statements/press-briefingpress-secretary-sarah?sanders-department-homeland-security-secretary-kirstjen-nielsen061818/ [https://web.archive.org/web/20180702131044/https://www.whitehouse.gov/briefings-statements/press-briefing-press-secretary-sarah-sanders-department-homeland-security-secretary-kirstjen-nielsen-061818/].

[43] *See* Ex. 6, Pls.' Reply In Supp. of Mot. to Compel Review of Docs. *In Camera*, *C.M. v. United States*, No. 2:19-cv-05217-SRB (D. Ariz. June 7, 2022), ECF No. 210-2 (May 24, 2018 U.S. Border Patrol flow chart showing that family units were separated before the adult went through the criminal or administrative process); *see also* Maria Sacchetti, *Lawyers for Migrants Say U.S. Officials Slowed Family Reunifications*, Wash. Post. (June 8, 2022, 12:07 AM), https://www.washingtonpost.com/nation/2022/06/08/migrant-families-reunifications-delayed/.

the adults were "amenable to prosecution," the government decided that they were not "available to provide care and physical custody"[44] to their children, which in turn rendered their children "unaccompanied" and subject to 8 U.S.C. § 1232(b)(3)'s custodial-transfer requirement.[45]

34.     The government never explained how a parent who is merely "amenable" to prosecution—but has not been charged with a crime, prosecuted, or in criminal custody—is, for that reason alone, unavailable to care for their child.  Nor did the government explain why CBP continued to separate families even after the U.S. Attorney's Office declined to prosecute the parent—eliminating the only purported justification for the separation.[46]

35.     The government was well aware of the harm that family separation would cause to parents and children.  For example:

a.     In September 2016, the DHS Advisory Committee on Family Residential Centers issued a report concluding that "separation of families for purposes of immigration enforcement or management, or

---

[44] 6 U.S.C § 279(g)(1) (defining "unaccompanied child").

[45] *See* Pls.' Reply In Supp. of Mot. to Compel Review of Docs. *In Camera* at 5, *C.M. v. United States*, No. 2:19-cv-05217-SRB (D. Ariz. June 7, 2022), ECF No. 210.  *But see Ms. L.*, 310 F. Supp. 3d at 1139 (explaining that "true 'unaccompanied alien children'" are those who arrive at the border without their parents, not those "detained with their parents at the border and who were thereafter separated from their parents"); *C.M.*, 2020 WL 1698191, at *3 n.4 (rejecting government's argument "that parents who are 'amenable to prosecution' under immigration statutes are 'unavailable to provide care or custody' to their children" requiring the children's transfer to ORR custody); *Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491, 495 n.2 (D.D.C. 2018) (children "rendered unaccompanied by the unilateral and likely unconstitutional actions of defendants. . . are not true unaccompanied minors").

[46] Pls.' Reply In Supp. of Mot. to Compel Review of Docs. *In Camera* at 6 n.11, *C.M. v. United States*, No. 2:19-cv-05217-SRB (D. Ariz. June 7, 2022), ECF No. 210 (citing May 10, 2018 email explaining "Yuma Sector has presented [family unit] adults for prosecution but all have been declined" and that "after the declination . . . adults are not being reunited with the children and they have not cancelled the placement requests for the children in the ORR portal," and May 10, 2018 memorandum stating that "Local [ICE Enforcement and Removal Operations] has been advised that once a child has been separated [Yuma Sector] will not try to reunite if prosecution is denied for parent"); *see also, e.g.*, *C.M.*, 2020 WL 1698191, at *3 ("The United States has cited to no statute explicitly authorizing the government to detain parents and children in separate facilities before it has charged either with a crime.  Indeed, no such statute exists."); *id.* (finding "no statute or regulation requir[ed] the detention of individuals who are 'amenable to prosecution' "); *accord Nunez Eucdea*, 2021 WL 4895748, at *4; *A.P.F.*, 492 F. Supp. 3d at 995-996 & n.3.

detention is never in the best interest of children." Far from it, in fact: Separation would have "traumatic and detrimental impact[s]."[47] The Advisory Committee also cautioned that separation is "traumatizing and extremely stressful for the parent who is dealing with the underlying situation but also possible feelings of guilt and worry for their child."[48] And that is not all. "[T]hreatening families with separation as means of control or retaliation breaks down the families and erodes the appropriate parent/child relationship. Families cannot thrive in settings such as these."[49] As a result, the Advisory Committee cautioned that "[c]hildren should not be separated from their parents in order to continue to detain the adults, or to continue to hold the children by placing them in ORR care."[50]

b. Commander Jonathan White, former Deputy Director of ORR for the Unaccompanied Alien Children's Program, testified before Congress that, starting in February 2017, he repeatedly warned those devising the Policy that separating children from their parents would likely harm the children, including giving rise to "significant potential for traumatic psychological injury to the child."[51] Documents reflect that Commander White raised these concerns on at least *27 separate*

---

[47] U.S. Immigr. & Customs Enf't, Dep't Of Homeland Sec., *Rep. of the DHS Advisory Committee on Family Residential Centers* 2, 9-11 (2016), https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf.

[48] *Id.* at 29.

[49] *Id.* at 28-29.

[50] *Id.* at 14.

[51] Jeremy Stahl, *The Trump Administration Was Warned Separation Would Be Horrific for Children, Did It Anyway*, SLATE (July 31, 2018, 5:05 PM), https://slate.com/news-and-politics/2018/07/the-trump-administration-was-warned-separation-would-be-horrific-for-children.html; *see also Examining the Failures of the Trump Administration's Inhumane Family Separation Policy: Hearing Before the Subcomm. on Oversight & Investigations of the H. Comm. on Energy & Commerce*, 116th Cong. (Feb. 7, 2019) (testimony of Commander Jonathan White), https://www.congress.gov/event/116th-congress/house-event/108846.

*occasions* between February 2017 and February 2018.[52]   Other government officials issued similar warnings.[53]

c.   In March 2017, the American Academy of Pediatrics issued a statement warning that the "trauma of" family separation could "exacerbate[]" the "emotional and physical stress children experience as they seek refuge in the United States."[54]

d.   In January 2018, the DHS Office for Civil Rights and Civil Liberties warned that the Policy could lead to "permanent family separation" and "new populations of U.S. Orphans."[55]

e.   Finally, the government was well aware from the pilot program that separating families would cause significant harm.  When ORR staff noticed a more than tenfold increase in the number of separated children entering its care in the summer of 2017, the then-Deputy Director of ORR for the Unaccompanied Alien Children's Program elevated concerns to senior ORR, HHS, CBP, and ICE officials about the traumatizing impact the separations would have on children's

---

[52] *See* Dickerson, *supra* note 16 (citing linked documents at https://www.documentcloud.org/documents/22123292-documents-i-obtained).

[53] *See* Susan Ferriss, Ctr. for Pub. Integrity, *The Trump Administration Knew Migrant Children Would Suffer from Family Separations. The Government Ramped up the Practice Anyway*, The Texas Tribune (Dec. 16, 2019, 12:00 AM), https://www.texastribune.org/2019/12/16/trump-administration-knew-family-separations-harm-migrant-children/ (recounting examples of internal records warning the government about the harm family separation would cause).

[54] *See* Am. Acad. of Pediatrics, *AAP Statement Opposing Separation of Mothers and Children at the Border* (Mar. 4, 2017), https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/immigrantmotherschildrenseparation.aspx [https://web.archive.org/web/20170318171325/https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/immigrantmotherschildrenseparation.aspx]; *see also* Letter to John Kelly, Sec'y, Dep't of Homeland Sec. from 184 Organizations 1 (Mar. 22, 2017), https://lulac.org/Family_Separation_Sign_On_Letter_3.22.17_FINAL.pdf    (signatories include the American Academy of Pediatrics, the American Psychological Association, RAICES, Human Rights Watch, Save the Children, and other national, state, and local organizations).

[55] *See* Dickerson, *supra* note 16.

wellbeing.[56]  Yet responsible officials failed to take steps to minimize the harm that "ORR staff warned was likely and [] ultimately did occur."[57]

36.    These reports and statements are consistent with scientific and medical evidence concluding that separating a child from their parent is extraordinarily harmful and can cause permanent emotional and behavioral problems and brain damage.[58]

37.    But for the government, that harm was the point.  By publicizing the trauma suffered by these families, the Administration hoped to use the Policy to deter others from crossing the border.  Numerous high-ranking officials confirmed as much:

a.    In early 2017, when DHS Secretary Kelly confirmed that the government was considering a family separation policy, he explained, "I would do almost anything to deter the people from Central America from getting on this very, very dangerous network that brings them up through Mexico into the United States."[59]

---

[56] *See* U.S. Dep't of Health & Human Servs., Off. of Inspector Gen., *OEI-BL-18-00510, Communication and Management Challenges Impeded HHS's Response to the Zero-Tolerance Policy* 15-16 (2020), https://oig.hhs.gov/oei/reports/oei-BL-18-00510.pdf [hereinafter *HHS OIG Communication Report*] (reporting that although ORR staff "[a]t several points before the zero-tolerance policy was implemented" communicated with senior officials "that [ORR] lacked the bed capacity to accommodate a large increase in separated children and were also concerned about the trauma such a policy would inflict on children," there was "no evidence" that officials "took action to protect children's interests in response to the information and concerns raised by ORR staff").

[57] *Id.* at 17.

[58] *See infra* notes 71-79 and accompanying text.  *See also* Allison Abrams, *Damage of Separating Families: The Psychological Effects on Children*, Psych. Today (June 22, 2018), https://www.psychologytoday.com/us/blog/nurturing-self-compassion/201806/damage-separating-families (reporting that children who are separated from a parent "develop insecure/disorganized attachment and persisting high levels of stress"); *id.* ("[T]he effects of mother-child separation on children's aggressive behavior are early and persistent."); Olga Khazan, *Separating Kids From Their Families Can Permanently Damage Their Brains: A Pediatrician Explains How the Trauma of Family Separation Can Change Biology*, The Atlantic (June 22, 2018), https://www.theatlantic.com/health/archive/2018/06/how-the-stress-of-separation-affects-immigrant-kids-brains/563468/ (noting that separating a child from their parents "can permanently affect . . . children's brains, especially if it occurs early in childhood").

[59] *Kelly Says Considering Separating Women, Children at Mexico Border*, Reuters (Mar. 6, 2017, 5:38 PM), https://www.reuters.com/article/us-usa-immigration-children/kelly-says-considering-separating-women-children-at-mexico-border-idUSKBN16D2OX.

b.    In August 2017, Gene Hamilton, a former aide to Sessions, instructed DHS officials "to generate paperwork laying out everything we could do to deter immigrants from coming to the U.S. illegally," leading to a memorandum discussing family separation as an option.[60]

c.    On May 11, 2018, Kelly—who, at that point, was serving as President Trump's Chief of Staff—repeated that "a big name of the game is deterrence." He continued that "[t]he children will be taken care of—put into foster care or whatever. But the big point is they elected to come illegally into the United States and this is a technique that no one hopes will be used extensively or for very long."[61]

d.    On June 18, 2018, in a Fox News interview, Sessions responded to a question about whether the Policy was meant as a deterrent with the answer: "I see the fact that no one was being prosecuted for this as a factor in a five-fold increase in four years in this kind of illegal immigration. So yes, hopefully people will get the message and come through the border at the port of entry and not break across the border unlawfully."[62]

e.    And on June 19, 2018, then-Assistant Secretary of HHS Steven Wagner told reporters: "We expect that the new policy will result in a deterrence effect, we certainly hope that parents stop bringing their kids on this dangerous journey and entering the country illegally."[63]

---

[60] Jonathan Blitzer, *How the Trump Administration Got Comfortable Separating Immigrant Kids from Their Parents*, New Yorker (May 30, 2018), https://www.newyorker.com/news-desk/how-the-trump-administration-got-comfortable-separating-immigrant-kids-from-their-parents.

[61] *Transcript: White House Chief Of Staff John Kelly's Interview With NPR*, NPR (May, 11, 2018, 11:36 AM), https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr.

[62] *Sessions Defends Zero Tolerance Immigration Policy* (Fox News television broadcast June 18, 2018), https://video.foxnews.com/v/5799065216001/#sp=show-clips.25.

[63] Bump, *supra* note 2.

38.     Put bluntly, the government made the express choice to intentionally cause parents and children extraordinary pain and suffering in order to accomplish its policy objectives.

### 3.     The Government Applies The Policy In A Deliberately Inhumane Manner To Cause Further Harm To Families.

39.     The mere fact of being forcibly separated from one's child or parent—potentially indefinitely, under such coercive circumstances, without knowledge of their wellbeing—is cruel enough.   But officers did not stop there.   Guided by the Family Separation Policy, officers subjected detained families to increasingly inhumane and unsafe conditions, deprived them of adequate food, adequate bedding, and sufficient space to sleep. Children and adults were packed into metal "cages" where overhead lighting "stay[ed] on around the clock."[64]  Many were initially detained in facilities so cold they were nicknamed "iceboxes."  Despite the frigid temperatures in these facilities, officers often gave migrants only thin aluminum blankets.[65]  Officers often refused to give migrants clean drinking water, forcing migrants to drink foul-smelling and -tasting water from taps next to toilets. There were inadequate restroom facilities, and many families went days or weeks without access to clean water, showers, soap, or toothpaste.[66]  Some traumatized children were forcibly medicated with powerful drugs, like Zoloft.[67]  As one District Judge observed, "the

[64] Nomaan Merchant, *Hundreds of Children Wait In Border Patrol Facility In Texas*, AP News (June 18, 2018), https://apnews.com/article/north-america-tx-state-wire-us-news-ap-top-news-border-patrols-9794de32d39d4c6f89fbefaea3780769.

[65] Mariana Alfaro, *Migrants Detained at the Border are Kept In Freezing Cells Nicknamed 'Iceboxes' — Here's What We Know about Them*, Bus. Insider (Dec. 27, 2018, 2:05 PM), https://www.businessinsider.com/migrants-detained-at-border-kept-in-freezing-cells-nicknamed-iceboxes-2018-12; Human Rights Watch, *In the Freezer: Abusive Conditions for Women and Children in US Immigration Holding Cells* (2018), https://www.hrw.org/sites/default/files/report_pdf/uscrd0218_web.pdf.

[66] *See* Human Rights Watch, *supra* note 65, at 16-19.

[67] *See, e.g.*, Laura Gomez, *State Inspectors Visited Six Southwest Key Facilities. Here's What They Found*, AZ Mirror (May 16, 2019), https://www.azmirror.com/2019/05/16/state-inspectors-visited-six-southwest-key-facilities-heres-what-they-found/; *U.S. Centers Force Migrant Children to Take Drugs: Lawsuit*, Reuters (June 20, 2018), https://www.reuters.com/article/us-usa-immigration-medication/u-s-centers-force-migrant-children-to-take-drugs-lawsuit-idUSKBN1JH076.

government actors responsible for the 'care and custody' of migrant children have, in fact, become their persecutors."[68]

40.    Parents waited and watched in terror as children were taken away, fearing that they were next.  Immigration officials often separated children in front of their parents, forcing parents to watch as their children were led away—with no idea of where their children were going, how long they would be apart, or whether they would ever be reunited. Sometimes, "the children were taken away under the pretense that they would be getting a bath."[69]  Other times, officials removed parents to another room and took their children away in their absence, depriving families of any opportunity to say goodbye.[70]

41.    The very fact of separation caused physical, mental, and emotional harm to parents and children.  This trauma is well-documented.  For example:

      a.    The HHS Office of the Inspector General acknowledged in a report that "separated children exhibited more fear, feelings of abandonment, and post-traumatic stress than did children who were not separated."[71]

      b.    Numerous agency officials also filed reports confirming the negative effects on health, wellbeing, and safety caused by family separation, characterizing this as "abuse while in Government custody."[72]  For example, one report noted that a separated child was "tearful" and

---

[68] *Ms. L. v. U.S. Immigr. & Customs Enf't*, 302 F. Supp. 3d 1149, 1166 (S.D. Cal. 2018).

[69] Camila Domonoske & Richard Gonzales, *What We Know: Family Separation And 'Zero Tolerance' at the Border*, NPR (June 19, 2018, 2:17 PM), https://www.npr.org/2018/06/19/621065383/what-we-know-family-separation-and-zero-tolerance-at-the-border.

[70] *See, e.g.*, Physicians for Human Rights, *"Part of My Heart Was Torn Away": What the U.S. Government Owes the Tortured Survivors of Family Separation* 16-17 (2022), https://phr.org/wp-content/uploads/2022/04/PHR_-Report_Deported-Parents_2022.pdf.

[71] U.S. Dep't of Health & Human Servs., Off. of Inspector Gen., *OEI-09-18-00431, Care Provider Facilities Described Challenges Addressing Mental Health Needs of Children in HHS Custody* 10 (2019), https://oig.hhs.gov/oei/reports/oei-09-18-00431.pdf [hereinafter *HHS OIG Care Provider Report*].

[72] Am. Immigr. Council, *Government Documents on Family Separation, Tracking the Policy's Evolution, Implementation, and Harm*, https://www.americanimmigrationcouncil.org/FOIA/government-documents-family-separation-tracking-policys-evolution-implementation-and-harm#toc-title-id-2 (last visited May 1, 2023).

"would not speak or engage in conversation with anyone."[73]  Another described a child who "developed suicidal ideations while detained after" being separated from his family.[74]

    c.    A Physicians for Human Rights investigation based on psychological evaluations of families separated under the Policy similarly "found pervasive symptoms and behaviors consistent with trauma; most met diagnostic criteria for at least one mental health condition, such as post-traumatic stress disorder, major depressive disorder, or generalized anxiety disorder consistent with, and likely linked to, the trauma of family separation."[75]  That trauma would also likely cause "an increased risk of psychiatric disorders such as anxiety, depression, and psychosis, and of detrimental coping behaviors such as smoking and the use of alcohol or drugs."[76]  The investigation ultimately concluded that the Family Separation Policy "constitute[d] cruel, inhuman, and degrading treatment" akin to "torture."[77]

42.    These harms can and do persist even after the eventual reunification with a parent or other family.[78]  Indeed, doctors have concluded that many of the children that the government separated from their parents will be seriously impaired for the rest of their

---

[73] *Id.*

[74] *Id.*

[75] Physicians for Human Rights, *"You Will Never See Your Child Again," The Persistent Psychological Effects of Family Separation* 3 (2020), https://phr.org/wp-content/uploads/2020/02/PHR-Report-2020-Family-Separation-Full-Report.pdf.

[76] *Id.* at 24.

[77] *Id.* at 5.

[78] *Nolasco*, 319 F. Supp. 3d at 503 (noting "[t]he psychological distress, anxiety, and depression associated with separation from a parent would follow the children well after the immediate period of separation – even after the eventual reunification with a parent or other family") (citing Julie M. Linton, Marsha Griffin, Alan J. Shapiro, & Council on Cmty. Pediatrics, Am. Acad. Of Pediatrics Pol'y Statement, *Detention of Immigrant Children*, 139 Pediatrics 1 (2017)).

lives[79] and experience "heightened feelings of anxiety and loss as a result of their unexpected separation from their parents after their arrival in the United States."[80]

43.     Compounding this trauma, parents and children were often not told for weeks where the other was located or when they would be reunited.  Officials failed to provide parents and children, including Plaintiffs, with any information regarding each other's whereabouts or wellbeing,[81] which "added to the distress and mental health needs of separated children."[82]   Nor did officers "provide for ready communication between separated parents and children."[83]   These failures "also contributed to children's anxiety and fear for their well-being."[84]

44.     Officials' failure to tell parents where their children were, and vice versa, is not surprising:  The government implemented the Policy knowing full well it had no system in place to adequately track and reunify separated families.[85]   CBP and ORR, which received custody of separated children from DHS, did not systematically track children after

---

[79] *Hearing on "Examining the Failures of the Trump Administration's Inhumane Family Separation Policy" Before the Subcomm. on Oversight and Investigations of the H. Comm. on Energy and Commerce*, 116th Cong. 3 (2019) (testimony of Dr. Jack P. Shonkoff, M.D., Professor of Child Health & Dev. at the Harvard Chan Sch. of Pub. Health & the Graduate Sch. of Educ. and Professor of Pediatrics at Harvard Med. Sch.), https://energycommerce.house.gov/sites/democrats.energycommerce.house.gov/files/documents/Shonkoff%20testimony%20FINAL_0.pdf.

[80] *HHS OIG Care Provider Report, supra* note 71, at 10 ("Children who did not understand why they were separated from their parents suffered elevated levels of mental distress.  For example, program directors and mental health clinicians reported that children who believed their parents had abandoned them were angry and confused.").

[81] Kevin Sieff, *The Chaotic Effort to Reunite Immigrant Parents with Their Separated Kids*, Wash. Post, (June 21, 2018, 8:26 PM) (reporting that "government authorities have often been unwilling to arrange phone calls between [separated parents and children], or provide details about where the child is held"), https://www.washingtonpost.com/world/the_americas/the-chaotic-effort-to-reunite-immigrant-parents-with-their-separated-kids/2018/06/21/325cceb2-7563-11e8-bda1-18e53a448a14_story.html.

[82] *See, e.g.*, *HHS OIG Care Provider Report, supra* note 71, at 11.

[83] *See Ms. L.*, 310 F. Supp. 3d at 1137.

[84] *HHS OIG Care Provider Report, supra* note 71, at 10-11.

[85] *See generally DOJ OIG Planning Report, supra* note 12, at 13-17; *House Report, supra* note 19, at 3 (discussing emails in December 2017 from HHS inquiring why children arriving in their custody were claiming to have been separated from parents).

they were separated from their parents.[86]  Border Patrol officials also rebuffed the idea that they should be required to track separated families.  When one judge demanded that the government actually begin "keep[ing] constant track of the children once they are separated from their parents," a border patrol official griped that this would "be a huge headache."[87]

45.     The government's failures delayed parents' ability to locate, communicate with, and be reunited with their children, causing even more anguish for separated families.

46.     The government's mandatory policy of separating parents from their children and the manner in which it was implemented violated the constitutional right to family integrity of the persons subject to the Policy, including Plaintiffs.

### 4.     The Government Initiates A Haphazard Reunification Process After Being Ordered To End The Family Separation Policy.

47.     The public backlash against the Family Separation Policy was swift and vociferous.[88]  In response, the government initially tried to backtrack and "vehemently denied" the Policy's existence.[89]

---

[86] *See generally DHS OIG Technology Report*, *supra* note 7; *Ms. L.*, 310 F. Supp. 3d at 1144.

[87] Dickerson, *supra* note 11, at 6, *After a Brownsville, Texas Magistrate Demands a List of Separated Families and Their Locations, a Border Patrol Agent Jokes, "I Might Be Spending Time in the Slammer"*.

[88] *See, e.g.*, Joel Rose & Marisa Peñaloza, *Protesters Across The U.S. Decry Policy of Separating Immigrant Families*, NPR (June 1, 2018, 5:05 PM), https://www.npr.org/2018/06/01/616257822/immigration-rights-activists-protest-trump-administration-child-separation-polic; Laura Bush, Opinion, *Separating Children from Their Parents at the Border 'Breaks my Heart'*, Wash. Post (June 17, 2018, 8:45 PM), https://www.washingtonpost.com/opinions/laura-bush-separating-children-from-their-parents-at-the-border-breaks-my-heart/2018/06/17/f2df517a-7287-11e8-9780-b1dd6a09b549_story.html ("[T]his zero-tolerance policy is cruel.  It is immoral.  And it breaks my heart."); David Smith & Tom Phillips, *Child Separations: Trump Faces Extreme Backlash from Public and His Own Party*, The Guardian (June 19, 2018), https://www.theguardian.com/us-news/2018/jun/19/child-separation-camps-trump-border-policy-backlash-republicans; Alexandra Yoon-Hendricks & Zoe Greenberg, *Protests Across U.S. Call for End to Migrant Family Separations*, N.Y. Times (June 30, 2018), https://www.nytimes.com/2018/06/30/us/politics/trump-protests-family-separation.html.

[89] *See* Christina Wilkie, *White House Denies Separating Families Is 'Policy,' but Insists It Is Needed 'to Protect Children*,' CNBC (June 18, 2018, 6:26 PM), https://www.cnbc.com/2018/06/18/white-house-denies-separating-families-is-policy.html; *see also The Way Forward on Border Security: Hearing Before the H. Comm. on Homeland Sec.*, 116th Cong. 46-48 (Mar. 6, 2019) (statement of Sec'y Kirstjen Nielsen, Dep't of Homeland Sec.).

48.    The public was not convinced.  In the face of continued outrage, and after forcibly separating thousands of families at the border over the course of more than two months, President Trump signed an Executive Order on June 20, 2018 purporting to address the situation.  The Executive Order proclaimed that it was the Administration's policy "to maintain family unity, including by detaining alien families together where appropriate and consistent with law and available resources."[90]

49.    The Executive Order refused to acknowledge the Family Separation Policy's existence, or that the Order represented a course-change from the status quo.  Perhaps as a result, the Executive Order also did not address how the government planned to reunite the thousands of children and parents who had been forcibly separated.

50.    Although officials publicly stated that the system was "unprepared" to quickly reunite families, federal officials actively tried in early May 2018, if not before, to *prevent* reunification because of concerns that reuniting families "too quickly" would undermine the Policy's goal of intimidating families.[91]

51.    Migrants who are prosecuted for crossing the border illegally are typically processed, arraigned, charged, and sentenced within a few hours in federal court and sentenced to time served.  Because ORR generally required more time to process and pick up children designated as unaccompanied from DHS custody, ORR was regularly refusing to accept children designated as unaccompanied based on a parent's criminal prosecution because their parents had returned from court and the children were no longer unaccompanied.  As a result, top ICE officials feared "a situation in which the parents are back in the exact same facility as their children . . . who have yet to be placed into ORR custody" and urged ICE to work with CBP "to prevent this from happening."[92]

---

[90] Affording Congress an Opportunity to Address Family Separation, Exec. Order No. 13,841, 83 Fed. Reg. 29,435 § 1 (June 20, 2018).

[91] Sacchetti, *supra* note 43.

[92] Ex. 11, Pls.' Reply In Supp. of Mot. to Compel Review of Docs. *In Camera*, *C.M. v. United States*, No. 2:19-cv-05217-SRB (D. Ariz. June 7, 2022), ECF No. 210-2 at 55 (Email from Matthew Albence to Thomas Homan, *ES-1325 Prosecutions and DHS Coordination 5-10-18(MA).docx* (May 10, 2018)).

52.     These concerns reached a "fever pitch" in May 2018 when Teh Johnson, then a top official in ICE's custody management division and later the acting ICE director, reported to other senior ICE officials that CBP was "[r]euniting adults with kids" at the busiest stretch of the southern border.[93]  "We can't have this," Matthew Albence, a high-ranking ICE official warned.[94]  One senior ICE official responded that "ORR needs [its] arm twisted."[95]  Johnson referred to reuniting unlawfully separated parents and children as "a fiasco."[96]

53.     To minimize the likelihood of reunification, Albence proposed having Border Patrol agents transport separated children to HHS custody "at an accelerated pace" rather than waiting for federal contractors to pick up and transport children to far away facilities.[97]  "[T]he expectation is that we are NOT to reunite the families and release," he wrote.[98]  A CBP official also instructed Border Patrol agents to "cease the reunification process" in border stations.  The next day, Albence messaged the CBP Commissioner, his deputy, and the acting ICE director about ORR's refusal to take children whose parents had returned from court, stating:  "This obviously undermines the entire effort and the Dept is going to look completely ridiculous if we go through the effort of prosecuting only to send them to a FRC [family residential center] and out the door."[99]

---

[93] Sacchetti, *supra* note 43.

[94] *Id.*; Ex. 16, Pls.' Reply In Supp. of Mot. to Compel Review of Docs. *In Camera*, *C.M. v. United States*, No. 2:19-cv-05217-SRB (D. Ariz. June 7, 2022), ECF No. 210-2 at 76 (Email from Matthew Albence to David Jennings, *CBP is Reuniting Adults with Kids* (May 25, 2018)).

[95] Ex. 16, Pls.' Reply In Supp. of Mot. to Compel Review of Docs. *In Camera*, *C.M. v. United States*, No. 2:19-cv-05217-SRB (D. Ariz. June 7, 2022), ECF No. 210-2 at 76 (Email from David Jennings to Matthew Albence, *CBP is Reuniting Adults with Kids* (May 25, 2018)).

[96] Ex. 16, Pls.' Reply In Supp. of Mot. to Compel Review of Docs. *In Camera*, *C.M. v. United States*, No. 2:19-cv-05217-SRB (D. Ariz. June 7, 2022), ECF No. 210-2 at 77 (Email from Tae Johnson to Matthew Albence & Nathalie Asher, *CBP is Reuniting Adults with Kids* (May 25, 2018)).

[97] Dickerson, *supra* note 16.

[98] *Id.*

[99] Sacchetti, *supra* note 43.

54.     As of June 22, 2018, the government still had "no procedure in place for the reunification of [separated] families."[100]  And top government officials continued to insist that it would reunite separated families "*only* for the purposes of removal."[101]

55.     On June 26, 2018, the Honorable Dana M. Sabraw of the Southern District of California held in *Ms. L.* that the Family Separation Policy—which disproportionally impacted individuals from Central America, including Plaintiffs—and the manner in which it was implemented, likely violated separated families' constitutional rights.[102] Accordingly, Judge Sabraw issued a class-wide preliminary injunction prohibiting DHS

---

[100] *Ms. L.*, 310 F. Supp. 3d at 1140-41.  Even after *Ms. L.* ordered the government to end the Family Separation Policy, the government continued to separate thousands of families. *See* John Washington, *The Government Has Taken at Least 1,100 Children from Their Parents Since Family Separations Officially Ended*, The Intercept (Dec. 9. 2019, 10:56 AM), https://theintercept.com/2019/12/09/family-separation-policy-lawsuit/.

[101] Ex. 15, Pls.' Reply In Supp. of Mot. to Compel Review of Docs. *In Camera*, *C.M. v. United States*, No. 2:19-cv-05217-SRB (D. Ariz. June 7, 2022), ECF No. 210-2 at 73 (Email from Matthew Albence to Robert Guadian, *HHS* (June 23, 2018)).

[102] *Ms. L.*, 310 F. Supp. 3d at 1142-46 (finding that plaintiffs were likely to succeed on the merits of their substantive due process claim).  The liberty interest identified in the Fifth Amendment provides a right to family integrity and familial association.  That right was "well established" even before it was recognized in *Ms. L. See Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) (stating "the relationship between parent and child is constitutionally protected"); *see also Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1079 (9th Cir. 2011) ("The substantive due process right to family integrity or to familial association is well established.").  As *Ms. L.* and several other courts have recognized, separating families threatens that right.  *See Ms. L.*, 302 F. Supp. 3d at 1161-67 (finding plaintiffs stated a legally cognizable claim for violations of their substantive due process rights under the Fifth Amendment to the United States Constitution based on their allegations that the government had separated them from their minor children, and kept them separated from their minor children, while they were held in immigration detention and without a showing that they were unfit parents or otherwise presented a danger to their children); *see also, e.g.*, *C.M.*, 2020 WL 1698191, at *4 ("Plaintiffs have plausibly alleged that the government's separation of their families violated their constitutional rights, which is not shielded by the discretionary function exception."); *A.P.F.*, 492 F. Supp. 3d at 996 (finding "the government's practice of separating families, and the procedures used to implement this practice, likely violated due process"); *Nunez Euceda*, 2021 WL 4895748, at *3 (same); *Nolasco*, 319 F. Supp. 3d at 502 (a family involuntarily separated after crossing the border "likely w[ould] succeed on their substantive due process claim premised on their constitutional right to family integrity"); *J.S.R. v. Sessions*, 330 F. Supp. 3d 731, 741 (D. Conn. 2018) (even the government "agree[d] that a constitutional violation occurred when the government separated children from their parents").

from separating families, subject to certain exceptions, and ordering the government to reunify families.[103]

56.    Only after Judge Sabraw issued the injunction did the government begin to reunify families.[104]  But because HHS and DHS "did not routinely collect and share the information necessary to identify, track, or connect families separated by DHS,"[105] reunification was chaotic, to say the least.[106]

57.    Reuniting thousands of children and parents would have been difficult no matter the circumstances, but the government's failure to track separated parents and children compounded the difficulties.  Many children were even "lost in the system" with no information on where they entered the country, when, or with whom.[107]  And some remain lost today.[108]

---

[103] *Ms. L.*, 310 F. Supp. 3d at 1140, 1141-46.  The injunction, among other things, prohibited the government from separating parents from their minor children in the future absent a determination that the parent is unfit or presents a danger to the child; prohibited the deportation of any detained parent before reunification with his or her separated children; and ordered the government to reunify parents separated from children under the age of five within 14 days, and to reunify parents separated from children aged five and older within 30 days.  *Id.* at 1149-50.  Each of the Plaintiff-Parents in this Complaint is a member of the class in *Ms. L.*  *See id.* at 1139 n.5 (defining parent class).

[104] U.S. Dep't of Homeland Sec., Off. of Inspector Gen., *OIG-18-84, Special Review – Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy* 10 (Sep. 27, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf [hereinafter *DHS OIG Highlights*].

[105] *HHS OIG Communication Report*, *supra* note 56, at 6; *see also* Dickerson, *supra* note 11, at 8, *Correspondence on Harried Reunification Efforts* (explaining that, as of June 23, 2018, the government was only able to link approximately 60 of the more than 2,200 separated families).

[106] Caitlin Dickerson, *Trump Administration in Chaotic Scramble to Reunify Migrant Families*, N.Y. Times (July 5, 2018), https://www.nytimes.com/2018/07/05/us/migrant-children-chaos-family-separation.html; Sieff, *supra* note 81.

[107] *DHS OIG Highlights*, *supra* note 104, at 10; *see, e.g.*, Ed Pilkington, *Parents of 545 Children Still Not Found Three Years after Trump Separation Policy*, The Guardian (Oct. 21, 2020), https://www.theguardian.com/us-news/2020/oct/21/trump-separation-policy-545-children-parents-still-not-found.

[108] Aline Barros, *Five Years Later, Work of Reuniting Families Separated at US-Mexico Border Remains Unfinished* (June 11, 2022), https://www.voanews.com/a/five-years-later-work-of-reuniting-families-separated-at-us-mexico-border-remains-unfinished/6610677.html.

58.     The lack of preparation is indefensible on its own, but it is particularly appalling given that the government was on notice of the need to prepare.  After the pilot separation program had concluded, CBP and ORR notified other parts of the government of the very deficiencies that eventually plagued the Policy's implementation.[109]  The DHS Office for Civil Rights and Civil Liberties also "recommended that an online database be created that family members could use to find one another in the detention system."[110] Despite these warnings, the government turned a blind eye to the obvious need for critical officer training, a system for tracking families, and a plan for eventual reunification, exhibiting a deliberate and utter indifference to human suffering generally, and the suffering of vulnerable migrants in its custody specifically.

59.     Judge Sabraw found these failures "startling."[111]  As he explained, the government routinely keeps track of "personal property of detainees in criminal and immigration proceedings," including "[m]oney, important documents, and automobiles, to name a few."[112]  "Yet, the government has no system in place to keep track of, provide effective communication with, and promptly produce alien children.  The unfortunate reality is that under the present system migrant children are not accounted for with the same efficiency and accuracy as *property*."[113]

### 5.     Families Are Separated A Second Time In Flagrant Disregard Of The Court's Order In *Ms. L.*

60.     In the eyes of separated families and the public, the *Ms. L.* order seemed like an important turning point.  Advocates championed the decision as "a complete victory" for

---

[109] *DHS OIG Technology Report*, *supra* note 7, at 14-15, 17-24.

[110] Dickerson, *supra* note 16.

[111] *Ms. L.*, 310 F. Supp. 3d at 1144.

[112] *Id.*

[113] *Id.*; *see also C.M.*, 2020 WL 1698191, at *2 ("Federal immigration officials . . . are tasked with the care and custody of those they detain, and owe detainees at least a minimal level of care.").

"parents and children who thought they may never see each other again."[114]  "Tears will be flowing in detention centers across the country when the families learn they will be reunited," they proclaimed.[115]  Even as the reunification process faced substantial delays due to the government's failure to track separated families, the press continued to report that the "family separation practice [had] end[ed]" and to share stories of joyous reunifications.[116]

61.    But for many families reunited under *Ms. L.*, that relief and joy was only temporary.  In countless instances, the government separated families a second time, in flagrant disregard of the court's injunction.[117]  Sometimes, the government separated families on the very same day that it had reunited them, just hours later.[118]  For other families, the second separations were carried out weeks or months after the families believed they were safely reunited.[119]

62.    Much like the original separations, the second separations were carried out by threat, force, and deceit.  Families that were re-separated immediately after reunification

---

[114] Jonathan Stempel & Doina Chiacu, *U.S. Judge Orders Migrant Families to be Reunited*, Reuters (June 26, 2018), https://www.reuters.com/article/us-usa-immigration-aclu/u-s-judge-orders-migrant-families-to-be-reunited-idUSKBN1JM2JA.

[115] Josh Gerstein & Ted Hesson, *Federal Judge Orders Trump Administration to Reunite Migrant Families*, Politico (June 27, 2018), https://www.politico.com/story/2018/06/26/judge-orders-trump-reunite-migrant-families-678809 (quotation marks omitted).

[116] *See, e.g.*, Julie Bosman & Miriam Jordan, *Mother is Reunited With Her Child After Family Separation Practice Ends*, NY Times (June 28, 2018), https://www.nytimes.com/2018/06/28/us/immigration-family-separation-brazil.html.

[117] *See* Shalayne Pulia, *At the Border, Newly Reunited Families Are Being Torn Apart Again*, Yahoo News (Aug. 31, 2018), https://news.yahoo.com/border-newly-reunited-families-being-154500040.html; Meredith Hoffman, *Trump Is Still Separating Families in Possible Violation of a Court Order*, Slate (Apr. 4, 2019), https://slate.com/news-and-politics/2019/04/trump-family-separation-border-threats-sabraw-aclu.html.

[118] *See* Robert Moore, *The Government Reunited Some Immigrant Families – Then Took the Children Away a Second Time*, Tex. Monthly (Aug. 6, 2018), https://www.texasmonthly.com/news-politics/government-reunited-immigrant-families-took-children-away-second-time.

[119] *See* Kevin Sieff, *Separated at the Border, Reunited, Then Separated Again: For Migrant Families, Another Trauma*, Wash. Post (Jan. 31, 2021), https://www.washingtonpost.com/world/the_americas/family-separations-biden-trump-honduras/2021/01/31/f6b815cc-6198-11eb-9430-e7c77b5b0297_story.html.

were provided with forms purporting to offer the parents a choice between being deported with their child, being deported without their child while their child's immigration case progressed, and talking to a lawyer.  But the forms were not written in their native language, and the joint deportation box was pre-checked.[120]  When migrants attempted to select another option, officials became angry, told them "you are not going to see your children ever again," and re-separated the families.[121]  Most parents ultimately capitulated in the face of the threat.

63.     Other parents, including Plaintiffs, were re-separated weeks later by force, when squadrons of armed guards wielding guns and canisters of tear gas entered their cells, handcuffed them, and dragged them onto buses without explanation.  Officers laughed as parents begged and cried for their children.  Many of the parents, including Plaintiffs, believed that they would never see their children again, and might even die.

64.     Once the families were reunited under *Ms. L.*, they never fathomed being separated again. Following the public outrage that the separations prompted across the country and the issuance of the *Ms. L.* injunction, the families believed that they had been reunited permanently and that they had governmental protection and assurance that such separations would never happen again.  As a result, the second separations were much more traumatic than the initial separations.

65.     Re-separating the parents and children a second time inflicted a unique form of harm.  The second separations compounded the significant trauma and distress the families had already suffered and left Plaintiffs with a fear and mistrust of authority. According to Plaintiffs and other re-separated families, their second separation was the worst event they ever experienced.  The second separation stripped away any semblance of

---

[120] Moore, *supra* note 118; *see also* Dickerson, *supra* note 11, at 8, *Reports that Reunification Forms Were Given to Parents In Languages They Did Not Understand* (email between government officials reporting that "in administering its new form on family reunification prior to removal, ICE doesn't seem to be providing effective language assistance").

[121] Moore, *supra* note 118.

reassurance the families felt from being reunited, leaving the parents and children to constantly wonder whether—and when—they might be separated yet again.

66.     In the end, the government's efforts to implement an unconstitutional policy that would intentionally inflict emotional distress on parents and children succeeded.  Even the government has acknowledged the profound negative impacts of the Family Separation Policy.[122]     Thousands of families—including Plaintiffs—are still living with these devastating consequences today.

      **B.**    **P.C.J. and M.C.J.**

          **1.**    **The First Separation of P.C.J. and M.C.J.**

67.     On May 18, 2018, Plaintiff-Parent P.C.J. and his thirteen-year-old son M.C.J. entered the United States near San Luis, Arizona, fleeing Guatemala to escape persecution and seek asylum.  They turned themselves in to CBP officers shortly after, and P.C.J. presented the officers with identification cards for both himself and M.C.J. explaining that M.C.J. was his son.  Without asking their reason for coming to the United States, officers placed P.C.J. and M.C.J. in a truck and drove them to a detention facility half an hour away in Phoenix.

68.     Officers separated P.C.J. and M.C.J. almost immediately upon arrival at the Phoenix facility.  They presented P.C.J. with paperwork in English to sign but did not explain the contents or provide an interpreter to P.C.J., who is a member of an indigenous Guatemalan tribe that primarily speaks Mam (a Mayan language).  Neither P.C.J. nor M.C.J. expected to be separated, nor did they understand what was happening.  The dreadful reality began to set in for P.C.J. when he noticed that parents and children were being held in different cells. But by that point, it was too late to ask questions—officers had already taken M.C.J. away.

---

[122] *See generally HHS OIG Care Provider Report*, *supra* note 71.

69.     P.C.J. was then taken to a cell with other adults.  Although he could see M.C.J., who was in a separate cell with other children, father and son were not able to speak to each other.

70.     The next day P.C.J. was forced to watch in horror from his cell window as M.C.J. was taken from his cell without any information on where he was being taken or for how long.

71.     Having never been apart from M.C.J. prior to the separation, P.C.J. was overwhelmed with confusion and sadness and cried incessantly.  He was shaken by the separation and worried deeply about M.C.J., wondering where he was and if he would be taken care of.  He learned about the Family Separation Policy from other detainees and was told there was no alternative to being separated.  Almost everyone around him was crying, and he witnessed people fainting.  According to P.C.J., the whole experience was psychologically very painful.

72.     P.C.J. was detained in about seven different places over a four-month period, beginning in Arizona and ending in Texas.  For the first few days, he was detained in a cell with a toilet but no bed.  He was given some soup but was unable to sleep.  P.C.J. spent the next 12 days in the "icebox," where he remained hungry, thirsty, and extremely concerned about his son and family.  He recalls officers treating him and other detainees like animals.  There were no beds in the icebox, and there was only one public toilet to share among the approximately six or seven detainees.  He was given cold broth twice a day, which was hardly enough sustenance; others around him fainted from hunger.  When P.C.J. and others asked for more food, they were ignored.  When they asked why the broth was cold, officers responded that this was the officers' country—not the detainees'.  P.C.J. had to sleep on the cold floor, and had no access to clean water, showers, or soap.

73.     During his time in the icebox, P.C.J. lost weight and suffered from stomach aches, diarrhea, colds, and headaches—all caused by the stress of the separation and the inhumane conditions of his confinement.  He constantly worried about M.C.J. and was especially concerned that M.C.J. might be suffering similar symptoms.  The uncertainty and

fear left P.C.J. unable to eat or sleep.  Seeing and hearing women in a similar icebox crying exacerbated the emotional toll of this experience.

74.    P.C.J. repeatedly asked officers where M.C.J. was and how to contact him, but they gave him no information.  It was not until a month and a half into the separation that P.C.J. was finally able to contact his son.  Other detainees had told P.C.J. to use a small half-sized piece of paper requesting that officers let him speak with his son.  P.C.J. filled out approximately six of these forms.  He received no response to the first five, but the officers approved his sixth request, and a phone call between P.C.J. and M.C.J. was arranged.  P.C.J. recalls the pain in M.C.J.'s voice when he spoke to him.  During the call, P.C.J. learned for the first time that M.C.J. was in Arizona.

75.    M.C.J. also suffered substantially during his time apart from P.C.J.  M.C.J. recalls crying constantly, and feeling isolated, helpless, and concerned for his father's wellbeing.  M.C.J. was especially distraught because he was not expecting to be separated from his father; the officers initially told him that his father would only be asked some questions and then they would be reunited.  But the next day, officers told M.C.J. and other children that they were going to be separated from their parents and transported them to a shelter.

76.    At the shelter, M.C.J. and the other children were not allowed to go outside. To prevent the children from escaping, shelter staff locked the children inside and constantly surveilled them.  M.C.J. anxiously waited for news from his father and repeatedly told shelter staff that he missed P.C.J.  M.C.J. also became ill while in detention.  He lost weight and struggled to eat because he was thinking about P.C.J. all the time and was not used to being without him.

77.    After being separated for approximately 67 days, P.C.J. and M.C.J. were reunited in Karnes City, Texas on or around July 24, 2018.  Neither P.C.J. nor M.C.J. were told in advance that they would be reunited, but they were thrilled to be reunited.  Upon being reunited, officers presented P.C.J. with some paperwork in English, which he signed.

Again, officers did not explain the contents of the documents nor did they provide P.C.J. with a translator or interpreter to understand them.

78. At Karnes, P.C.J. and M.C.J. were placed in a cell together with another detainee and his son. P.C.J. and others asked officers when they would be released, but the officers refused to answer them.

79. P.C.J. finally felt at peace when he was reunited with M.C.J. Unfortunately, that sense of relief was short-lived.

### 2. The Second Separation of P.C.J. and M.C.J.

80. On August 15, 2018, P.C.J. and about 50 other detainees were in the courtyard of the detention center. About 30 men, including P.C.J., formed a prayer group and were praying and singing, while one detainee played a guitar an officer had previously given them. M.C.J. was at school at the time.

81. Exasperated with the prolonged detention and fearful about his future, P.C.J. vented to other detainees about their situations and the lack of information about their cases. At some point, officers approached the group, seized the guitar, and ordered the men to stop playing, threatening them with deportation if they protested. Another officer joined in, taunting the detainees that the officers could do whatever they wanted to them and that if the detainees resisted, the officers would deport them. The officers then sent the men to their cells.

82. About an hour later, P.C.J. realized there were around a dozen armed men standing outside P.C.J.'s door. The officers were in uniforms, boots, vests, and helmets; they all had guns on belts around their waists; and at least one had a cannister, presumably containing tear gas or something similar. P.C.J. was confused, shocked, and terrified at the sight.

83. Several armed officers entered P.C.J.'s cell and called him by name, demanding that he stand up. P.C.J., who stands no taller than 5 feet and at that point weighed under 120 pounds, was frightened and complied with their orders. The officers surrounded him on both sides and from behind. One officer grabbed P.C.J.'s right arm and

another grabbed his left arm, then forcibly handcuffed P.C.J. behind his back with zip ties. The encounter was violent and physically harmed P.C.J.

84.    Petrified about what might happen next, P.C.J. started to cry and asked for his son. Although he resisted leaving his cell at first, officers physically dragged him out to the entrance hall with about a dozen other detainees—all of whom were also crying and pleading for their sons. The officers initially told P.C.J. that he would be able to talk to M.C.J. immediately, and was being taken to see his son. But P.C.J. quickly realized that was not the case, and the officers eventually stopped answering his questions about where M.C.J. was.

85.    P.C.J. and the other men spent about an hour in this entrance hall. Officers then took P.C.J. and the other detainees outside and put them on a bus, accompanied by one officer—all without any explanation of what was happening. The officers who took them away from Karnes told the men they would never see their children again. A separate car with approximately six officers followed. P.C.J. was still handcuffed and did not know where they were going.

86.    P.C.J. cried during the entire two-and-a-half hour journey. He was overwhelmed with worry and anxiety, wondering where he was being taken, whether he would ever be able to leave, whether he would be sent to another icebox, and whether he was going to die. But most of all, P.C.J. worried and feared about M.C.J.—whether he was safe and what would happen to him.

87.    P.C.J. and the other men arrived at their destination, the Pearsall Detention Center, in the middle of the night on or about August 16, 2018.

88.    Officers then put P.C.J. in a cell with four other men. They gave P.C.J. a new ID and new uniforms, paperwork to sign, and a telephone calling card with three minutes on it that they said he could use to call his family. P.C.J. did not understand the contents of the paperwork, which was not written in his native language, and no one read the documents to him, offered to translate the documents, or even gave him time to try to comprehend them. When P.C.J. was given a new uniform, he became distraught, worried that it meant

that his detention was permanent and that he would never see his son again.  At some point, officers moved P.C.J.'s handcuffs from behind his back to the front of his body so he could eat.  But P.C.J. could not eat; he just kept crying for his son.

89.     At about 3:00 A.M., two officers took P.C.J. and placed him in a small windowless room.  There was a slot in the door only big enough to pass food.  After the door was shut and locked, officers finally reached through the slot to remove his handcuffs.

90.     Alone in his small cell, P.C.J. struggled with the psychological trauma of the separation.  He was unable to sleep or eat and could not stop crying in pain.  It was the worst moment of P.C.J.'s life, as he did not know if M.C.J. was dead or alive.

91.     The cell brought back many painful memories of P.C.J.'s first detention.  Like the icebox he was previously detained in, P.C.J.'s cell was frigid. There was a concrete bed and he was given only a sheet, which did not keep him warm.  As with his first detention, P.C.J. could hear other parents crying and shouting for their missing children, compounding the emotional trauma of the experience.  And as before, officers refused to provide him with any information about why he had been separated from his son, or whether they would ever be reunited.  P.C.J. thought he would die of sadness and of the cold.

92.     When officers passed his cell, P.C.J. cried out that he needed to call his family.  Although one officer said he would return with a phone, he never came back.

93.     Meanwhile, M.C.J. was in school with about 17 other children when an officer removed him and another student from the room and notified them they would be separated from their fathers but would not tell them for how long.  The officer informed the children that they would be sent back to their home countries, and that their fathers would remain in ICE custody.  The children began crying, but the teachers would not let them leave the room, purportedly for their safety.

94.     Officers then took M.C.J. to a separate room where they offered him food and toys, but M.C.J. refused to eat or play and could not stop crying.  At some point, pastors also came to visit the children, who cried with the children and tried to comfort them. Meanwhile, the officers taunted the children, asking them where their fathers were and

telling the children that they would not see their fathers again.  That evening, officers visited M.C.J. and again told him he would be deported and that his father might also be deported. M.C.J. remained distraught through the morning and continued to refuse food and toys.

95.    The next day, on Thursday, August 16, 2018, an officer approached M.C.J. and told him that his father would be returning that day.  That same day, at Pearsall, officers came to P.C.J.'s cell, handcuffed him without explanation, and placed him on a bus with about 15 other men.  At the time, P.C.J. had no idea what was happening or where the officers were taking him.  P.C.J. recalls feeling like he had lost his mind and thinking about taking his own life because he could no longer bear the stress of being apart from his child.

96.    When P.C.J. returned to Karnes, he was overjoyed to see M.C.J. but was still emotionally distraught from the separation.  P.C.J.'s fear that officers would take M.C.J. from him again kept him from eating and sleeping even after reunification.  P.C.J. was timid and avoided the officers from this point on, worried that he and M.C.J. could be punished and separated a third time—perhaps permanently—for any reason or no reason at all.

### 3.    Harms and Losses

97.    As a direct result of the United States government's actions, Plaintiffs P.C.J. and M.C.J. suffered, and continue to suffer, significant physical and emotional harm.

98.    Throughout his time in detention, P.C.J. was starved, roughly handled, unable to sleep, twice separated from his son, and deliberately threatened that he would never again see his son.

99.    During the first separation, P.C.J. lost weight and suffered from diarrhea, headaches, and colds.  He suffered psychological trauma induced by his separation from M.C.J. and the fear of not knowing what M.C.J. was experiencing.  The conditions of confinement also exacerbated P.C.J.'s despair.  Not knowing whether M.C.J. was alive or dead left P.C.J. feeling disturbed, upset, and unable to think of anything but his loved ones. P.C.J. was so distraught and preoccupied that he could not sleep.

100.    M.C.J. also fell ill during the first separation.  He had trouble sleeping and eating and worried constantly about his father's wellbeing.  The cruel laughing and taunting

he was subjected to during the second separation further prolonged and exacerbated M.C.J.'s pain.

101.    The separations continue to take a physical and emotional toll on both P.C.J. and M.C.J.  P.C.J. tries not to think of the separations but they come to mind almost weekly. When it happens, he cries and experiences heart palpitations, headaches, and diarrhea.

102.    M.C.J. likewise continues to suffer from the toll wrought by the separations. M.C.J. still has trouble sleeping, struggles with persistent sadness and a sense of inadequacy, and has a tendency to distrust others and feel emotionally isolated.   The separations left him feeling unsure of whether there is a defect in himself, and he is constantly fearful that he will lose his father.

**C.    O.P.V. and T.P.C.**

**1.    The First Separation of O.P.V. and T.P.C.**

103.    On or around May 30, 2018, O.P.V. and his seven-year-old son T.P.C. entered the United States near San Luis, Arizona and were apprehended by CBP officers shortly thereafter.  Officers drove them to the Yuma Border Patrol Station, a.k.a. the "icebox," where they were separated shortly thereafter.  At some point, O.P.V. was forced to sign paperwork in English that he did not understand.  He was not provided a translator or interpreter, and officers did not explain the contents of the documents.

104.    During their few hours in the icebox, officers gave O.P.V. and T.P.C. only aluminum blankets for warmth and cold soup to eat.  Although O.P.V. did not know what was happening initially, the sight of crying children and parents being pulled apart worried him.

105.    At some point, officers approached O.P.V. and commanded that he hand T.P.C. over to them.  Both O.P.V. and T.P.C. resisted as T.P.C. clung to O.P.V.  Officers forcefully pulled T.P.C.'s hand and ripped T.P.C. from O.P.V.'s arms.  As they both sobbed, O.P.V. promised T.P.C. he would never leave him.  O.P.V. recalls feeling exasperated, distraught, and helpless not knowing what was going to happen to T.P.C., where he was going, or when he would see him again.  Once they were separated, O.P.V. cried constantly.

106.   T.P.C. was processed as an unaccompanied minor and, on June 3, 2018, he was transferred to the Southwest Key Juvenile Center, a shelter in Phoenix, Arizona that has been investigated by the Arizona Department of Health Services for child abuse.[123] T.P.C. recalls seeing the facility being overrun with police officers.   There were about 50 other children there.   T.P.C. felt frightened and was sad to be away from his father.   He cried incessantly, like most other children around him.   Prior to the separation, T.P.C. exhibited no symptoms of illness.   But soon after the separation, health personnel began medicating T.P.C. through injections multiple times per day.   The medication hurt T.P.C. and made him feel sleepy.   No one ever explained to T.P.C. why he was receiving these injections or what medication they contained.

107.   Prior to the separation, officers had asked O.P.V. whether there was a possible custodian for his son in the United States.   O.P.V. listed the name and contact information for an aunt living in Georgia.   T.P.C. was allowed to speak with his aunt on the phone several times while he was detained in Phoenix, but there is no evidence that ICE ever asked the aunt to serve as a sponsor for T.P.C.

108.   Throughout the separation, O.P.V. was detained in several facilities across Arizona, California, and Texas.   On or about June 3, 2018, he was transferred to Florence, Arizona.   On or about June 10, 2018, O.P.V. was transferred to Victorville, California.   On or about June 24, 2018, he was transferred to Adelanto, California.   On or about July 17, 2018, O.P.V. was transferred to Los Fresnos, Texas.

109.   Although O.P.V.'s locations may have varied, his pleas remained the same: At every opportunity, he asked officials about his son's whereabouts, to no avail.   At one point, he learned from other detainees that he could submit a request to contact his son by

---

[123] *See* Joseph Flaherty, *Southwest Key Employees Preyed on Detained Migrant Kids, Records Say*, Phoenix New Times (Aug. 3, 2018), https://www.phoenixnewtimes.com/news/southwest-key-employees-preyed-on-immigrant-kids-records-say-10679116; Gomez, *supra* note 67; Scott Neuman, *Allegations of Sexual Abuse Surface at Arizona Shelters for Migrant Children*, NPR (Aug. 3, 2018), https://www.npr.org/2018/08/03/635203037/allegations-of-sexual-abuse-surface-at-arizona-shelters-for-migrant-children.

filling out a small piece of paper, but because officials never kept O.P.V. in one place for very long, those requests went unanswered.

110.    It was not until O.P.V.'s transfer to Los Fresnos in mid-July 2018—over a month into the separation—that he was able to contact his son.  Officers approached O.P.V., informing him that he had a phone call.  It was then that he learned that T.P.C. was in a shelter in Phoenix, Arizona.

111.    O.P.V. used calling cards to call the shelter approximately twenty times during his separation from T.P.C.  Most of the time, the shelter did not answer the phone at all or told O.P.V. they could not bring T.P.C. to the phone at that time.  Every time the shelter did get T.P.C. on the phone, T.P.C. would cry and ask O.P.V. when his father would come pick T.P.C. up—a question that O.P.V. could not answer.  T.P.C. would beg his father to come get him, tell his father that he did not want to be at the shelter any longer, and ask if O.P.V. did not want him anymore.  O.P.V. felt heartbroken and like he had failed as a father.

112.    On July 22, 2018, ORR notified the ICE Chief Counsel that T.P.C. would be transferred from the Southwest Key Center in Arizona to the Adelanto ICE Processing Center in California to be released to his father's custody.

113.    O.P.V. and T.P.C. were apart for almost 69 days before they were reunited in Karnes, Texas on July 25, 2018.  When O.P.V. saw T.P.C., he was sad and worried to see that T.P.C. had lost weight and that his mouth was swollen.  T.P.C. could not explain what happened to his mouth but told O.P.V. it was painful.  Gone untreated, the pain worsened and stopped T.P.C. from eating at one point.

114.    In early August, O.P.V. approached an ICE officer for help with his son, explaining that T.P.C.'s teeth were hurting and that he had stopped eating.  O.P.V. hoped the officer would help T.P.C. see a dentist.  But the officer instead threatened O.P.V. with problems if his son refused to eat.  The officer then took a picture of O.P.V.'s Karnes identification card.  O.P.V. and T.P.C. never received any follow-up help or medical care at that time.

## 2.    The Second Separation of O.P.V. and T.P.C.

115.    Less than a month after their reunification, on August 15, 2018, O.P.V. was sitting in the recreation area of Karnes playing cards with some other men.  Officers carrying weapons then entered the recreation area, handcuffed three detainees, and ordered O.P.V. and the other detainees to go back to their cells.

116.    Once in his room, O.P.V. peered through the window of his cell and saw the area filled with officers wearing helmets and bullet-proof vests and carrying guns and tear-gas canisters.  A few minutes later, several of those armed officers came through O.P.V.'s door calling his name and yelling for him to put his hands up.  O.P.V., frightened, put his hands up as the officers yelled for him to put his hands up higher.  They then placed him in handcuffs.  O.P.V. asked what was happening, but the officers refused to tell him.  Two officers then grabbed O.P.V. by the arms and carried him out of the room.  Another officer yelled at O.P.V. and asked him if he remembered talking about his son's eating problems the week prior.  It was not clear to O.P.V. why officers were asking this question, and they never gave him an opportunity to explain or answer.  Other officers standing in the hallway were shouting at O.P.V. and the other fathers, while some laughed as the fathers cried.

117.    O.P.V. and more than a dozen other handcuffed fathers were placed on a bus. The men were not given any information about where they were going or why.  When O.P.V. or others tried to ask for an explanation, the officers just laughed.  When they asked about their children, the officers laughed harder.  The cruelty of the officers during this time shocks and troubles O.P.V. to this day.

118.    After some hours, the bus arrived at a detention center in Pearsall, Texas, where O.P.V. was given a new uniform, chained around the waist, and placed in solitary confinement.  Only after he was locked in his cell did officers remove his handcuffs.

119.    When O.P.V. and the other fathers were being transferred from Karnes to Pearsall, their children were in school.  Officers removed the children, including T.P.C., from the classroom and placed them in the clinic instead.  They were forced to sleep there and were prohibited from returning to the cells they had been sharing with their parents.

T.P.C. and the other children asked about their parents, but staff gave them no information about where their fathers had been taken, why they could not be together, or whether they would ever be reunited.

120. Meanwhile, at Pearsall, officers kept O.P.V. in solitary confinement, refused to provide him with any information, and rejected his requests to contact his family. He was given only a few small cups of water and some bread. During his time in Pearsall, he witnessed other fathers cry, faint, and vomit. Not knowing where T.P.C. was and what would happen to him exacerbated O.P.V.'s anxiety and despair. He felt confused and tense, and was unable to sleep. Having promised T.P.C. that they would not be apart again, he felt like he betrayed T.P.C. and failed him as a father. Frustrated and helpless, O.P.V. beat his head against the wall. O.P.V. feared the second separation would never end, and that he would never see T.P.C. again.

121. The next day, on or about August 16, 2018—again without warning or explanation—officers placed O.P.V. in handcuffs, removed him from his cell, and placed him on a bus back to Karnes where he was reunited with T.P.C.

122. On two occasions in early October 2018, officers visited detained families in the courtyard at Karnes and spread misinformation about their rights under the *Ms. L.* class action. O.P.V. recalls officials telling families that they could not obtain relief under the settlement and that their only option to leave detention was to sign deportation forms and withdraw from the class action.

### 3. Harms and Losses

123. As a direct result of the United States government's actions, Plaintiffs O.P.V. and T.P.C. suffered, and continue to suffer, significant physical and emotional harm.

124. O.P.V. continues to struggle with the trauma of having his son taken from him, spending nearly two months without knowing T.P.C.'s whereabouts or conditions, and believing he would never see him again. During the first separation, O.P.V. was in a constant state of tension and fear, and cried almost every day. O.P.V. was unable to sleep, lost his appetite, and was overwhelmed with anxiety about what would happen to his son.

He suffered insomnia, flashbacks, nightmares, intrusive thoughts, hypervigilance, difficulty concentrating, overwhelming sadness, and a lack of interest in usual activities.  Even when he was finally able to speak with T.P.C. by phone, the distance from his son and O.P.V.'s inability to calm his son's fears instilled in O.P.V. a sense of terror and helplessness.  O.P.V. was also deeply traumatized by the sense that he had lost the ability to provide fatherly protection for his young son.  O.P.V. was overwhelmed with feelings of guilt, failure, and impending doom.  He became depressed and thought about killing himself but tried to be strong for his son.

125.    The feelings of relief and security upon O.P.V. and T.P.C.'s first reunion in July 2018 were short-lived.  The wholly unexpected and violent second separation, only three weeks later, not only intensified O.P.V.'s and T.P.C.'s trauma from the initial separation but also piled on new, worse symptoms.

126.    According to O.P.V., the second separation was the most traumatic event he has ever experienced.  He is haunted by the memory of officers in full riot gear coming to his room, yelling for him to put up his hands, handcuffing him, pointing assault weapons at him, and laughing at him for crying.  During O.P.V.'s time in Pearsall, he feared he was losing his mind, had difficulty thinking, was unable to sleep, and experienced constant tension and fear.  His inability to get information about or help T.P.C. exacerbated these feelings.  O.P.V. recalls beating his head against the wall, feeling powerless, and having suicidal thoughts.

127.    In addition to the psychological trauma, the second separation caused O.P.V. to develop physical ailments in the form of backaches, headaches, and chest pains.  He received medical treatment upon his return to Karnes to reduce the pain.  At the time, health personnel had also expressed concern about O.P.V.'s mental health and, upon evaluating him, diagnosed him with an adjustment reaction disorder as a result of the second separation.

128.   The pain and memory of the separations, seared in O.P.V.'s mind, caused O.P.V. to suffer severe anxiety and depression.  He continues to feel broken and damaged, and feels that he lost confidence in himself as a parent.

129.   T.P.C.'s mental and physical health similarly declined during the two-month separation.  Being detained and separated from his father while far from everything he has ever known left seven-year-old T.P.C. feeling confused, scared, alone, frustrated, irritable, worried, and plagued with thoughts about death.

130.   Whatever small degree of safety and trust was restored by the first reunification was quickly shattered by the second separation a few weeks later.  T.P.C.'s emotional turmoil took a physical toll when his teeth became infected.  The pain worsened until he could no longer eat.  As a result, T.P.C. lost weight rapidly.  It was only after several days of excruciating pain and inability to consume solid foods that officers finally took T.P.C. to a doctor in San Antonio and had at least four of his teeth removed.

131.   T.P.C.'s ability to regulate his emotions and cope with stress, already impaired by the first separation, was further disrupted by the second separation.  He stopped going to school for fear that his father would disappear again while T.P.C. was there.  T.P.C. also has vivid, traumatic nightmares involving ICE officers and about his father being killed.

132.   Though reunited, the trauma of the separations has not subsided for either O.P.V. or T.P.C.  Both continue to grapple with the lasting physical and psychological effects and remain in constant fear of losing one another again.

## CLAIMS FOR RELIEF

### COUNT 1: Intentional Infliction of Emotional Distress

133.   All prior allegations set forth in this Complaint are incorporated by reference as though set forth fully herein.

134.   By engaging in the acts described in this Complaint, Defendant and the federal officials and officers referenced above engaged in extreme and outrageous conduct

with an intent to cause, or a reckless disregard of the probability of causing, Plaintiffs to suffer severe emotional distress.

135.   Additionally, to the extent the officials and officers involved in the alleged conduct were independent contractors, those independent contractors acted under the control and pursuant to the direction of Defendant and federal officials.

136.   As a direct and proximate result of that conduct, Plaintiffs suffered and continue to suffer severe emotional distress and substantial damages.

137.   Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for intentional infliction of emotional distress.

**COUNT 2: Negligence**

138.   All prior allegations set forth in this Complaint are incorporated by reference as though set forth fully herein.

139.   Defendant and the federal officials and officers referenced above had a nondelegable and nondiscretionary duty to Plaintiffs to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs, as well as a nondelegable and nondiscretionary duty of protection and aid against harm.

140.   By engaging in the alleged acts herein, Defendant and the federal officials and officers referenced above failed to act with ordinary care and breached the duties of care and protection owed to Plaintiffs.

141.   Additionally, to the extent the officials and officers involved in the alleged conduct were independent contractors, those independent contractors acted under the control and pursuant to the direction of Defendant and federal officials.

142.   As a direct and proximate result of the referenced conduct, Plaintiffs suffered and continue to suffer substantial damages.

143.   Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for negligence.

1    **COUNT 3: Loss of Consortium**

2       144.    All prior allegations set forth in this Complaint are incorporated by reference

3    as though set forth fully herein.

4       145.    By engaging in the alleged acts herein, Defendant and the federal officials

5    and officers referenced above committed the torts of negligence and intentional infliction

6    of emotional distress and caused substantial trauma and significant interference in the

7    parent-child relationship.

8       146.    Additionally, to the extent the officials and officers involved in the alleged

9    conduct were independent contractors, those independent contractors acted under the

10   control and pursuant to the direction of Defendant and federal officials.

11      147.    As a direct and proximate cause of the referenced conduct, Plaintiffs suffered

12   and continue to suffer substantial trauma, loss of society, companionship, care, support,

13   affection, and substantial damages.

14      148.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for

15   loss of consortium.

16                          **PRAYER FOR RELIEF**

17      **WHEREFORE,** Plaintiffs respectfully request:

18      A.      Compensatory damages;

19      B.      Attorneys' fees and costs pursuant to, among other provisions, the Equal

20   Access to Justice Act, 28 U.S.C. § 2412; and

21      C.      Such other and further relief as the Court may deem just and appropriate.

22                          **DEMAND FOR JURY TRIAL**

23      FTCA claims are tried to the bench.  28 U.S.C. § 2402.  Plaintiffs demand a jury trial

24   on any claims that are, at the time of trial, triable by jury, whether because of a change of

25   law or an amendment to the pleadings.

26

27

28

1   RESPECTFULLY SUBMITTED this 5th day of May, 2023.

2                                                   LEWIS ROCA ROTHGERBER CHRISTIE LLP

3                                                   By: _s/Allison Whitehill_____
                                                        Allison Whitehill
4                                                       Gary Bendinger
                                                        Katie Derrig
5
                                                        Justin W. Bernick*
6                                                       Danielle Desaulniers Stempel*
                                                        Michael J. West*
7                                                       Dana A. Raphael*
                                                        Melissa Giangrande*
8                                                       David Willner*
                                                        HOGAN LOVELLS US LLP
9
                                                        Vanessa Rivas-Bernardy*
10                                                      REFUGEE AND IMMIGRANT CENTER FOR
                                                        EDUCATION AND LEGAL SERVICES (RAICES)
11
                                                        *Attorneys for Plaintiffs*
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28